IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LARRY P. HIGGINS,

        Plaintiff,

        v.                       Civil Action No. 2:06-CV-107

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I. Introduction**

A.    <u>Background</u>

    Plaintiff, Larry P. Higgins, (Claimant), filed his Complaint on November 13, 2006,

seeking Judicial review pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3) of an adverse decision

by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his

Answer on January 16, 2007.[2]  Claimant filed his Motion for Summary Judgment on February

14, 2007.[3]  Commissioner filed his Motion for Summary Judgment on March 29, 2007.[4]

B.    <u>The Pleadings</u>

    1.    <u>Claimant's Motion for Summary Judgment</u>.

    2.    <u>Commissioner's Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 4.

[3] Docket No. 7.

[4] Docket No. 10

C.      <u>Recommendation</u>

I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED.

2.      Commissioner's Motion for Summary Judgment be GRANTED. The ALJ properly determined that Claimant's sleep-related impairments were non-severe, properly determined Claimant's RFC and properly considered the combined effects of Claimant's impairments. In this case, there is substantial evidence to support the ALJ's decision. Accordingly, the ALJ's decision should be affirmed.

## II. Facts

A.      <u>Procedural History</u>

Claimant filed an application for Supplemental Security Income Benefits and Disability Insurance Benefits on July 9, 2004, alleging disability since May 21, 2004. The applications were initially denied on October 4, 2004 and on reconsideration on April 6, 2005. Claimant requested a hearing before an Administrative Law Judge, ["ALJ"], and received a hearing on February 16, 2006. On June 5, 2006, the ALJ issued a decision adverse to Claimant. Claimant requested review by the Appeals Council but was denied. Claimant filed this action, which proceeded as set forth above.

B.      <u>Personal History</u>

Claimant was 51-years-old on the date of the February 16, 2006 hearing before the ALJ.

Claimant completed high school and two years of college.[5] Claimant has prior work experience as a letter carrier for the United States Postal Service from 1984 to 2004.

C.  Medical History

The following medical history is relevant to the time period during which the ALJ concluded Claimant was not under a disability: May 21, 2004 through June 5, 2006.

**Steven L. Corder, M.D., 12/2/97, Tr. 157**
Assessment: Improving.

**Steven L. Corder, M.D., 10/14/97, Tr. 158**
Assessment: Return of Depression

**Imad M. Khreim, M.D., 7/11/97, Tr. 160**
Assessment: Major depression in remission.  The patient decreased the Prozac to 10 mg q.d.

**Imad M. Khreim, M.D., 5/20/97, Tr. 161**
Assessment: Major depression in remission.

**Fernando J. Manalac, M.D., 11/15/96, Tr. 164**
Mental Status: Oriented to time, place and person. Concentration is good.  There is no
            appreciable cognitive or intellectual deficit.
Diagnostic Impression:
        Axis I: Major depression, single episode, without phychosis.
        Axis II: Adjustment disorder with marked emotional features.  History of past alcohol
and     substance abuse.
        Axis III: Possible prostrate enlargement.
        Axis IV: Moderate to severe stressors: conflict at work.
        Axis V: Past GAF: 55.  Present GAF: 50

**Fernando J. Manalac, M.D., 8/18/97, Tr. 167**
Final diagnoses: Major depression single episode.  Adjustment disorder, marked emotional
features.  History of alcohol abuse.

**William L. Noble, M.D., 8/2/01, Tr. 183**

---

[5] The record is inconsistent as to the number of years of college completed by Claimant. In the Disability Report dated September 15, 2005, Claimant reported he completed two years of college.  (Tr. 97).  On November 15, 2005, however, Claimant reported to Dr. Manalac that he completed three months of college at West Virginia Northern Community College.  (Tr. 165).

Impression: ILO Classification is 0/0 with no pleural abnormalities or active process.

**Melvin T. Saludes, M.D., 1/28/03, Tr. 184**
Assessment: 1. Obstructive sleep apnea and hypopnea syndrome. 2. Excessive daytime sleepiness.

**Melvin T. Saludes, M.D., 2/19/02, Tr. 186**
Conclusion: No cardiac or pulmonary limitation to exercise. The patient achieved normal exercise capacity. No evidence of deconditioning.

**Melvin T. Saludes, M.D., 2/19/02, Tr. 184**
Assessment: 1. Excessive sleep apnea, possible idiopathic hypersomnolence. 2. Depression.

**Melvin T. Saludes, M.D., 10/16/01, Tr. 188**
Assessment: 1. Excessive daytime sleepiness. 2. Mild obstructive apnea syndrome.

**Melvin T. Saludes, M.D., 12/18/01, Tr. 189**
Assessment: 1. Excessive daytime sleepiness. 2. Mild obstructive sleep apnea.

**Melvin T. Saludes, M.D., 1/21/02, Tr. 190**
Assessment: 1. Excessive daytime sleepiness. 2. Exertional dyspnea. 3. Depression.

**Melvin T. Saludes, M.D., 7/16/01, Tr. 191**
Impression: 1. Mild obstructive sleep apnea syndrome primarily during REM sleep. 2. Mild periodic leg movements of sleep.

**Melvin T. Saludes, M.D., 3/26/01, Tr. 194**
Assessment: 1. Obstructive sleep apnea syndrome. 2. Prostatic hypertrophy.

**William Trusnovic, M.D., 2/7/04, Tr. 200**
Impression: Chest pain

**Thomas J. Zekan, M.D., 2/13/04, Tr. 219**
Impression: No acute disease

**Catherine Courts, M.A., 8/13/04, Tr. 229**
Diagnosis per DSM-IV Criteria:
    Axis I: 286.32 Major Depressive Disorder, recurrent, moderate; 303.9: Alcohol dependence, in remission.
    Axis II: 301.9: Personality Disorder, NOS (w/narcissistic, paranoid histrionic features)
Medical Source Statement: The Claimant has had multiple confrontations with supervisors. Despite maintaining stable employment for many years he has difficulty with insight into how his behavior (i.e.: slow work pace; sarcastic/antagonistic communications) may contribute to these problems. He does note a long history of depression and anxiety, which may also play a

role in his socialization difficulties and sleeping problems.  Although he has an adequate intellectual ability, memory and concentration, it is his behavior style/socialization that affects his ability to adapt to the work environment.

**Catherine Courts, M.A., 6/16/04, Tr. 233**
Diagnostic Impressions:
        Axis I: 296.32 - Major depressive disorder, recurrent, moderate
            303.9 - Alcohol dependence, in remission
        Axis II: 301.9 - Personality disorder, not otherwise specified, with narcissistic, paranoid and histrionic features.
        Axis III: Sleep disorder, restless leg syndrome, heel spur (as reported by client)
        Axis IV: Psychosocial stressors: occupational problems, and problems with primary support group.
        Axis V: Current GAF: 50

**Harshhugre, M.A., 6/15/04, Tr. 239**
Clinical Impressions
        Axis I: 296.32 - Major depressive disorder, recurrent, moderate
            347: narcolepsy reported by client
        Axis II: R/O Personality Disorder
        Acis III: None
        Axis IV: 04 - Occupational problems
        Axis V: Current GAF: 47

**(DDS Physician), 9/1/04, Tr. 243**
Physical Residual Functional Capacity Assessment
Exertional Limitations: None established
Postural Limitations: None established
Manipulative Limitations: None established
Visual Limitations: None established
Communicative Limitations: None established
Environmental Limitations: None established
Symptoms: While the claimant alleges physical problems, the medical evidence fails to support the disabling degree of pain and limitations alleged by the claimant.  Therefore, the claimant is not felt to be credible.   Agree with above - subjective versus objective evidence indicates client is not credible and RFC is non-severe physically.

**Steve Saxby, Ph.D., 9/18/04, Tr. 252**
Psychiatric Review Technique
Affective Disorders:
        Depressive symptoms characterized by anhedonia or pervasive loss of interest in almost all activities or sleep disturbance or decreased energy.
        Manic Depressive Disorder
Personality Disorders

Inflexible and maladaptive personality traits which cause either significant impairment or social or occupational functioning or subjective distress, as evidenced by at least one of the following: intense and unstable interpersonal relationships and impulsive and damaging behavior.

Substance Addiction Disorders
ETOH Dependence, in remission.

"C" Criteria of the Listings: Evidence does not establish the presence of the "C" Criteria.

## Steve Saxby, Ph.D., 9/12/04, Tr. 266
Mental Residual Functional Capacity Assessment

Claimant can perform simple, routine, repetitive work in a stable environment. He remains capable of understanding and remembering instructions, concentrating, interacting appropriately with people and adapting to changing activities within the workplace. He is able to maintain concentration and attention for extended periods of time. He would be able to maintain regular attendance and be punctual. Morever, he could be expected to complete a normal workweek without exacerbation of psychological symptoms. His frustration tolerance is low. Additionally, he has a history of distractive behavior. In spite of a history of difficulty interacting with the general public, the claimant has the ability to get along with others in the workplace. Although the claimant has a history of difficulty interacting with coworkers, he has the ability to work without distracting them. He evidences some limitation in dealing with work stresses and public contact. The claimant indicates that he can get along with co-workers and his customers. Based on the evidence of record, the claimant's allegations are found to be partially credible as to the severity of the level of impairment.

## (DDS Physician), M.D., 3/16/05, Tr. 270
Physical Residual Functional Capacity Assessment

Exertional Limitations:
Occasionally lift or carry: 50 pounds
Frequently lift or carry: 25 pounds
Stand and/or walk: about 6 hours in a 8 hour workday
Sit for a total of: about 6 hours in an 8 hour workday
Push and/or pull: unlimited, other than as shown for lift and/or carry

Postural Limitations: None established
Manipulative Limitations: None established
Visual Limitations: None established
Communicative Limitations: None established
Environmental Limitations:
Extreme Cold/Extreme Heat: Avoid Concentrated Exposure
Wetness/Humidity/Noise/Vibration/Fumes, odors, etc/Hazards: Unlimited

Symptoms: The symptoms are attributable to a medically determinable impairment. Claimant is partially credible. He denies most of the symptoms he is alleging at his most recent physical exam. His lungs are clear, his BP is stable, he was prescribed new orthodics for his heel spurs. Claimant states on pain questionnaire that most of his pain is "emotional pain." Household chores include taking out the trash. Pain and fatigue considered but not limited to the effects

alleged. ....I agree to above.  All considered and RFC reduced to medium.

**Debra Lilly, Ph.D., 3/26/05, Tr. 280**
Mental Residual Functional Capacity Assessment
This is a 50 year old male with only recent mental health treatment.  He has a history of substance abuse, but now denies this.  His diagnosis is major depressive disorder, but he reports mood swings, obsessive-compulsive symptoms, and irritability.  His report and that of his wife focus on forgetfulness.  The evidence in file clearly shows that he has no evidence of cognitive impairments and he makes no complaints nor does hit wife to his treating source regarding this.  They are considered to have limited credibility.  The claimant's primary focus in treatment is irritability and anger control issues.  The evidence reflects that he has no legal history and his anger issues result in argumentativeness.  The claimant's source reported in July 2004 that he could return to work and there are no statements to the contrary in file.  The claimant may have the above limitations.  He retains the ability to learn and perform a variety of work-like activities in settings that require limited interactions with others, focus on production demands, and stress.

**Debra L. Lilly, Ph.D., 3/26/05, Tr. 282**
Psychiatric Review Technique
Affective Disorders: Major depression
Substance Addiction Disorders: Denies current use
Restriction of Activities in Daily Living: Mild
Difficulties in Maintaining Social Functioning: Moderate
Difficulties in Maintaining Concentration, Persistence, or Pace: Moderate
Episodes of Decompensation, Each of Extended Duration: None
"C" Criteria of Listings: Evidence does not establish the presence of the "C" Criteria.

**Surekha Kurapati, M.D., 4/28/05, Tr. 299**
Diagnoses:
        Axis I: Bi-polar II, currently in depressive phase
        Axis II: Personality disorder not otherwise specified
        Axis V: GAF 50, serious impairment

**Surekha Kurapati, M.D., 1/14/05, Tr. 301**
Diagnoses:
        Axis I: Major depression, recurrent.
        Axis I: Rule out Bi-polar Disorder II.
        Axis I: Past history of polysubstance dependence in full recovery.
        Axis I: Personality disorder not otherwise specified.
        Axis V: GAF 50-55.

**Surekha Kurapati, M.D., 11/23/04, Tr. 302**
Diagnosis: Plantar fasciitis and heel spur syndrome.
Assessment:
        Axis I: Major depression recurrent. Rule out bipolar II. Past history of polysubstance, in

full recovery. Personality disorder NOS.
Axis V: GAF: 55, moderate impairment.

### Surekha Kurapati, M.D., 10/18/04, Tr. 307
Assessment: Major depression, recurrent.  Rule out bipolar II, needs further observation.  Past history of polysubstance dependence, in full recovery. Personality disorder NOS.  GAF: 55, moderate impairment.

### Surekha Kurapati, M.D., 9/15/04, Tr. 309
Assessment: Hypertension.  Hyperlipidemia.  Chronic DJD.  Hx Prostrate Ca S/P Rad Rx/Brachyrx.  Hx Polysubstance abuse.  Hx depression.  Hx erectile dysfunction.  Plantar fasciitis.  Hx sleep apnea and excessive daytime somnolence.

### Surekha Kurapati, M.D., 8/17/04, Tr. 319
Assessment:
 Axis I: Major depression, recurrent.
 Axis I: Rule out bi-polar disorder.
 Axis I: Past history of polysubstance dependence, in full recovery.
 Axis II: Deferred.
 Axis III: No significant problems.
 Axis IV: Currently unemployed.  Problems in interpersonal relationships especially with authority figures.
 Axis V: 55, moderate impairment.

### Surekha Kurapati, M.D., 7/16/04, Tr. 323
Assessment:
 Axis I: major depression, recurrent. Rule out bipolar d/o; past history of polysubstance dependence.
 Axis II: Deferred.
 Axis V: GAF: 50-55.

### Melvin T. Saludes, M.D., 5/21/02, Tr. 345
Assessment: 1. Excessive daytime sleepiness - probable hypersolmnolence.

### Saed Ahmed, M.D., 11/11/05, Tr. 348
Assessment: Possible pancreatitis; Leukocytosis; Hypertension; Bipolar.

### Surekha Kurapati, M.D., 2/6/06, Tr. 354
Diagnoses: no changes. Axis I: bipolar disorder II. Restless leg syndrome. Personality not otherwise specified. Axis V: GAF 55, moderate impairment.

### Surekha Kurapati, M.D., 12/6/05, Tr. 355
Assessment: Axis I: bipolar disorder, type II.  Personality disorder NOS.  Restless leg syndrome. Axis V: GAF 50 to 55.

**Surekha Kurapati, M.D., 11/2/05, Tr. 356**
Assessment: Hypertension. Hyperlipidemia. Chronic DJD. Hx Prostate CA S/P Rad
Rx/Brachyrx. Hx Polusubstance abuse. Hx depression. Hx erectile dysfunction. Plantar
fasciitis. Hx sleep apnea and excessive daytime somnolence. Bipolar disorder.

**Surekha Kurapati, M.D., 10/4/05, Tr. 362**
Diagnoses: Axis I: Bipolar disorder, type II. Personality disorder NOS. Restless leg syndrome.
Axis V: GAF 50-55.

**Surekha Kurapati, M.D., 7/7/05, Tr. 363**
Assessment: Axis I: Bipolar disorder type II. Personality disorder NOS. Axis V: GAF 50 to 55.

**Surekha Kurapati, M.D., 5/27/05, Tr. 365**
Assessment: Axis I: Bipolar disorder type II, affective disorder. Axis I: Personality disorder
NOS. Axis V: GAF 50.

**Surekha Kurapati, M.D., 5/25/05, Tr. 376**
Assessment: Axis I: Major depression recurrent. Bipolar II very likely. Personality disorder
NOS. Axis V: GAF 50 to 55.

**Surekha Kurapati, M.D., 1/14/05, Tr. 380**
Diagnoses: Axis I: Major depression, recurrent. Axis I: Rule out bi-polar disorder II. Axis I:
Past history of polysubstance dependence in full recovery. Axis I: Personality disorder not
otherwise specified. Axis V: GAF 50-55.

D.    Testimonial Evidence

        Testimony was taken at the June 5, 2006 hearing. The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ATTORNEY]  (Tr. 36)

        Q        Do you still drive?

        A        Occasionally, limited.

        Q        Why is it limited?

        A        Cause I do have a tendency to fall asleep so I limit myself.

        Q        How did you get here today?

        A        A friend drove me up.

Q      When did you last work for the Postal Service?

A      May 21, 19, I mean 2004.

Q      And how long had you worked for them?

A      Almost 20 years, 19 and a half.

Q      And what did you do for them?

A      I was a letter carrier.

Q      Were you a letter carrier that whole time?

A      Yes.

Q      And just give me a brief idea of what your day involved as a letter carrier.

A      Initially when I first was employed I walked all day, I'd go in the morning, I'd case mail for approximately two hours.

Q      By case mail you mean sort it?

A      It's sorting mail in order of sequence for delivery and then we would load the trucks, I would load the trucks and well, then go out to the street and deliver the mail.  Towards the end I had what, a split route it driving and park and loop, unload the mail, I'd go in case the mail which is sequence the mail, load the mail, drive to the route, deliver most of my boxes were delivered from the vehicle, I had some that I had to get out and go deliver and then I had one or park and loop relays which I had to go 20 minutes [INAUDIBLE].

Q      When you say park and loop that's  where you make a loop of residences and come back to your house?

A      Yes.

Q       Or come back to your car excuse me.  What's the most you had to lift as a letter carrier?

A       I think it was supposed to be like 35 pounds with the satchel on, I'm not really sure but I know it was always more than what it was supposed to be, I don't know, I'd say 35-40 pounds.

Q       And why did you stop working in May of 04?

A       My employer put me off work, told me to go home and not come back.

Q       And do you know why they did that?

A       She was, I think she was afraid of me.

Q       Did she have reason to be afraid of you?

A       I don't know, I didn't think so at the time but reviewing it perhaps.

ALJ       Why?

CLMT       I have a tendency to be aggressive in stressful situations.

Q       And that's what the paperwork said is that correct, that you were aggressive on the job or aggressive on the floor?

A       Yes, yes.

ALJ       And you got disability for being aggressive?

CLMT       Well she, they didn't want to let me come back to work.  I, they said I had to have psychological clearance before I could come back to work and I really wasn't able to obtain that.  It's just about as simple as it is.

ALJ       If you, if you could have got this psychological clearance to satisfy the Postal Service would you have gone back to your job?

CLMT        I wanted to.  Yeah I wanted to.

ALJ         But you never did, were successful getting it?

CLMT        No.

Q     Do you think you could have done the job if you had gone back?

A     I don't know, looking back now I don't think so because it just seemed to get perpetually worse.

Q     What was, what was happening on the job at the end?

A     Well it was pretty stressful in the sense that because of my medical problems they, they were really onto my case, I mean, by case I mean on me ever since my prostate cancer I have to go to the bathroom a lot so they were timing every time I went to the bathroom and they would stand over my shoulder and tell me I had to work faster and just all kinds of things that just I think you know added to - -

Q     What was your reaction to that?

Q     Well, I told them you know I told them that this really bothers me that you do this and they're like well I don't care if it bothers you or not I'm not going to go ahead and do it anyway and, and I couldn't, I couldn't get any support, I tried the union I couldn't get any support from them I even went to the National Labor Relations Board and they never even responded I couldn't, I couldn't believe it.

Q     Were you responding aggressively?

A     I didn't think so you know I personally didn't think so but obviously other people did I mean I like to say I'm passive/aggressive, I don't know, and my idea of passive/aggressive I don't know if that's a real definition for passive/aggressive but I sometimes get, do the silent

12

treatment and that kind of stuff and, and I, I believe it probably did increase tension you know, I didn't really mean for it to but after talking to my therapist and going to counselors and stuff I believe it probably did increase the tension [INAUDIBLE].

Q        There's reference in your psychiatric notes or psychological notes to you being very angry.

A        Yeah I have been at times.

Q        Does that manifest itself?

A        Yeah it's, it was pretty uncontrollable I think now that I'm on lithium it's been much better but I sleep more.

                              *                    *                    *

Q        You just, you handed a written list of your medications.

A        Yes.

Q        Do you think they're helping?

A        Most things seem to be improving except my depression I get, my depression just seems to be getting worse and my sleep I, I mean I still sleep all the time, 16 to 18 hours a day.

Q        Why do you feel your depression's getting worse?

A        I just have these emotional outbursts that I can't control.

Q        By that do you mean crying?

A        Yeah crying usually, sometimes I don't know just isolating other, other ways.

Q        Now the sleep problem you've actually been diagnosed with a sleep disorder is that correct?

A        Yes.

Q        What are you getting by way of treatment for that?

A        I take Provigil, it's narcoleptic drug and it helps me both with my breathing and with my sleeping.  When I initially went to Dr. Saludas [phonetic] who is the one who prescribed it I was having breathing problems [INAUDIBLE] I couldn't catch my breath, I don't know if it was the anxiety or what.  We did all the tests but also I was having the, the sleep problems I was, I would fall asleep very quickly, I would just get completely exhausted and then it's just like I had to go to sleep and so we did a lot of tests, sleep studies all kinds of things and we tried C-PAP, he said I had a sleep apnea, we tried the C-PAP, I couldn't tolerate cause my face would break out and I'd get migraine headaches and so - -

Q        So you're not using the C-PAP any longer?

A        No.

Q        But you still are on the Provigil?

A        Yes.

Q        Now Provigil's designed to keep you from sleeping so much during the day?

A        Yes or to not fall asleep so quickly.

Q        Is it working?

A        Yeah, it works whenever I, yeah it works, it helps my breathing too is the main thing.  Cause I don't get that panicky breathing when I take the Provigil.

Q        In a typical 24-hour period how much of the time are you sleeping?

A        Probably an average of 16 hours a day.

Q        That's all the time I mean consistently that kind of schedule?

A        Yeah it's pretty consistent.

14

Q       Do you ever feel rested?

A       Never.  I never wake up feeling rested never.  I always wake up feeling tired.

Q       Besides sleeping how else do you spend your time?

A       Well, I, my kids get a lot of those cross search word puzzle books and I, I do those, I like to play a game on the computer once in a while, it's called free cell.

Q       Do you ever fall asleep doing a puzzle or playing a game?

A       Oh yeah.  I don't read a lot, I do try and read once in a while but it's, it's one of those things that it's hard to read and concentrate.  My comprehension's not real good either it's like I, sometimes I have to read something three or four times to really get the understanding or the meaning of it.

Q       Do you go anywhere during the day?

A       Oh sometimes I, I might go to a meeting like a 12-step meeting or something like that.  I might go visit with my mother.

Q       Do you use alcohol now?

A       Oh no, I haven't used alcohol for 15 years.

Q       But you still attend meetings?

A       Yes occasion, well I used to attend daily but since I've gotten, since my, I don't attend as frequently as I used to.  I just don't, I don't have the energy and I don't have the passion that I had before.

Q       If the Postal Service offered you your job back could you do it?

A       No, but I'd love to take it.  The money was good.

Q       Why don't you think you could do it?

A        I, the biggest I don't know, I, I don't know.  I just think I'd have a real difficult time controlling my emotions whether it was the depression or the aggressiveness.  When I see them even out at a restaurant I get this rage inside of me and I just have to go the other way so.

Q        Do you think those same problems would crop up at a different job?

A        It would be hard to say.  I really don't know I worked at the Post Office for a little long, thinking, I'm just trying to think back to other jobs I had before that.  I, I've had some problems at others jobs before but it, I don't know I think it's probably because my illness seems to be progressing I don't it just seems that way to me that I, I just, I don't handle things as well as I used to.  I don't know if that's, that's just my opinion.

*                    *                    *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]  (Tr. 44).

Q        Would you state your name sir please.

A        Yes, my name is Larry Ostrowski.

Q        And your profession?

A        I am a rehabilitation counselor.

Q        We have a copy of your resume in the file at Exhibit 6B and I'll ask you whether that is a complete and accurate summary of your professional background and qualifications?

A        Yes, Your Honor.

ALJ        Counselor any objections regarding the VE?

ATTY        No, sir.

Q        Now sir you have been called to appear and testify as an expert witness.  Prior to the hearing have you discussed the merits of this case with me or anybody else [INAUDIBLE]?

A      No, Your Honor.

Q      Prior to the hearing have you ever had any sort of contact with the claimant?

A      No, Your Honor.

Q      Now the fee for your services here today will be paid by Social Security.  In spite of that fact are you ready and able to act as an impartial witness?

A      Yes.

Q      Have you had an opportunity to review the vocational aspects of the file?

A      Yes, Your Honor.

Q      Is there any other information about the claimant's past work that you would need?

A      I don't believe so Your Honor.

Q      Then would you describe the claimant's work in the past 15 years in terms of skill and exceptional level?

A      Yes, Your Honor.  Since 1984 until 2005 he worked as a, for the U.S. Postal Service as a mail carrier.  According to the DOT mail carrier is medium and semi-skilled.

Q      All right.  Then let me ask you to assume a hypothetical individual of the claimant's age, educational background and work history who would be able to perform medium work but should not do any overhead lifting or reaching, should work in a low stress environment with no production line type of pace or independent decision making responsibilities, would be limited at this time to unskilled work involving only routine and repetitive instructions and tasks, should have the minimal possible interaction, no more than occasional with other persons.  Would there be any work in the regional or national economy

that such a person could perform?

A     Yes, Your Honor and I'll define the local economy as the Wheeling/Bridgeport metropolitan statistical area, there would be the work of a kitchen helper, in the local economy there are 127 jobs, in the national economy 195,973 jobs.  There would be the work of an equipment cleaner, in the local economy three are 182 jobs, in the national economy 193,245 jobs.  There would be the work of a packer, in the local economy there are 45 jobs, in the national economy 97,152 jobs.

Q     And if the person were limited to a light exceptional level with these other limitations?

A     Yes, Your Honor there would be the work of an office helper, in the local economy

there are 61 jobs, in the national economy 162,479 jobs.  There would be the work of a mail clerk and that would be working in private industry as opposed to working for the Postal Service, there are 35 jobs in the local economy, 79,258 in the national economy. There would be the work of a sewing machine operator, in the local economy there are 47 jobs, in the national economy 114,248 jobs.

Q     And is anything in your testimony inconsistent with anything in the DOT?

A     No, Your Honor.

ALJ      Counselor.

ATTY     Thank you, Your Honor.

*          *          *

[EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY]  (Tr. 47).

Q      Dr. Ostrowski does the DOT address stress?

A      No.

Q      So would you agree that from a vocational perspective stress can be a very

individual thing?

A      Absolutely.

Q      So while some, one employee may be affected by working around people another

one may be affected by the pace or even the  mere act of showing up every day?

A      Yes.

Q      If our hypothetical claimant by reason of either psychological problems or a sleep

disorder is off task even as much as 20% of the day is that consistent with competitive

employment?

A      No, it is not.  There would be no jobs for this hypothetical individual.

                              *                    *                    *

E.      Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing

and through medical records.  The information is included in the report to demonstrate how the

Claimant's alleged impairments affect his daily life.

Works word-search puzzle books.  (Tr. 99)

Plays with the flowers in the yard.  (Tr. 99)

Reads.  (Tr. 99, 103)

Occasionally makes a sandwich or warms items in the microwave.  (Tr. 101, 122)

Eats snacks a couple of times a day.  (Tr. 101)

Takes garbage out once per week for five minutes.  (Tr. 101)

Mows lawn once a month for a half-hour.  (Tr. 101)

Goes outside each day for a few minutes.  (Tr. 102, 144)

Walks around the yard or sits on his steps.  (Tr. 102)

Travels by walking or by driving.  (Tr. 102)

Goes to the grocery store and to the dollar store.  (Tr. 102)

Counts change and uses a checkbook/money order.  (Tr. 102)

Listens to Music.  (Tr. 103)

Tries to attend a 12-Step meeting at least a couple of times per week.  (Tr. 103)

Talks with friends.  (Tr. 103)

Watches television.  (Tr. 121)

Shaves, once in a while.  (Tr. 142)

Bathes and cares for hair, occasionally.  (Tr. 142)

Shops to look at craft items, household items or clothes.  (Tr. 144)

### III.  The Motions for Summary Judgment

A.      Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence.  The Court has construed Claimant's brief to allege three instances of error on the ALJ's part: 1) the ALJ failed to find that Claimant's sleep impairments and related symptoms rose to the level of a severe impairment;  2) the ALJ failed to properly consider Claimant's impairments when determining Claimant's RFC and limitations; 3) the ALJ failed to consider the combined effects of Claimant's impairments.

Commissioner contends the ALJ's decision is supported by substantial evidence and should therefore be affirmed. Specifically, Commissioner contends 1) the ALJ properly determined that Claimant's sleep impairments and related symptoms were non-severe, 2) the ALJ properly determined Claimant's RFC and limitations after careful consideration of the medical evidence and testimony at the hearing, and 3) the ALJ did consider the combined effects of Claimant's limitations.

B.     The Standards.

        1.     Summary Judgment.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

        2.     Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §§ 405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

        3.     Social Security - Medically Determinable Impairment - Burden. Claimant bears

the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.      <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.      <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly

indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

        8.      <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

        9.      <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether he has a severe impairment, 3) whether his impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform his past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, he will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

C.     <u>Discussion</u>

        1.      <u>Whether the ALJ Erred In Characterizing Claimant's Sleep Impairments and Resulting Symptoms As Non-Severe Impairments.</u>

Claimant alleged in his original Disability Report dated September 15, 2005 that he was limited in his ability to work due to depression, anxiety, sleep disorders, breathing disorder, prostate cancer and heel spurs. (Tr. 90). The ALJ, after reading the medical evidence and listening to the hearing testimony, concluded Claimant had the following severe impairments:

shoulder pain syndrome, history of heel spurs, major depressive disorder with later diagnosis changed to bipolar disorder II, and personality disorder. (Tr. 16). The ALJ explicitly concluded "[a]fter a careful consideration of the claimant's testimony, the medical evidence of record and the record in its entirety, . . . the claimant's impairments of . . . sleep apnea with excessive daytimes sleepiness . . . are 'not severe' in that they cause no more than minimal limitations on his functioning." (Tr. 17).

Claimant now alleges the ALJ erred in concluding Claimant's sleep impairments and related symptoms did not give rise to a severe impairment. Specifically, Claimant argues that his sleep apnea, excessive daytime sleepiness and related symptoms of fatigue and narcolepsy make him incapable of performing substantial gainful activity due to the likelihood of "unexpectedly falling asleep." Commissioner argues that the ALJ was correct in characterizing Claimant's sleep impairments as non-severe, as there was substantial evidence Claimant's sleep impairments did not significantly impact Claimant's ability to perform basic work activities. This Court finds the ALJ's determination is supported by substantial evidence and should be affirmed.

An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). Where an impairment "can be reasonably controlled by medication or treatment, it is not disabling." Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). Furthermore, when evaluating the effect of a claimant's subjective symptoms on their ability to work, the ALJ will evaluate the extent to which the claimant's symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529; see, generally, Craig v. Chater, 76

F.3d 585, 592-93 (4th Cir. 1996).

As noted by the ALJ, the medical evidence well documents Claimant's treatment history surrounding sleep apnea and excessive daytime sleepiness. (Tr. 184-194, 299, 301, 346). While the record is unclear as to the precise diagnosis of Claimant's sleep-related complaints,[6] there is substantial evidence to support the ALJ's justifiably loose determination that "claimant has had problems with sleep apnea and excessive daytime sleepiness." (Tr. 17). This Court also finds there is substantial evidence to support the ALJ's conclusion that "the objective evidence does not support the claimant's subjective complaints" relating to his sleep-related impairments. (Tr. 22).

First and foremost, Claimant's testimony as to his lifestyle directly contradicts the severity of the alleged symptoms arising from his sleep impairments. In his Function Report dated August 5, 2004 and January 27, 2005, Claimant reports that he "sleeps sixteen hours per day . . . wake up tired and with no energy; . . . sleeps all the time - or am totally exhausted." (Tr. 99, 148). At the hearing, Claimant testified that he never feels rested and falls asleep while doing activities such as doing a puzzle or playing a game. (Tr. 13). ) The aforementioned subjective symptoms of Claimant's are contradicted by Claimant's own report that he is able to do engage in activities that include doing word search puzzles, mowing the lawn, taking out the

---

[6] In 2001, Dr. Saludes first diagnosed Claimant with sleep apnea and excessive daytime sleepiness and proscribed Provigil to relieve Claimant's symptoms (Tr. 191, 194, 184). In 2002, Dr. Saludes then opined that he did not believe Claimant's persistent daytime sleepiness was due to sleep apnea. (Tr. 187). He opined that Claimant may be tired as a result of frequent urination during the night, depression, or lack of exercise. (Tr. 187, 188, 189). In January 2003, however, Dr. Saludes concluded that Claimant's sleep apnea was worsening. In October 2004, Dr. Kurapati - after reviewing Claimant's medical records from Pittsburgh Neurology - concluded Claimant did not suffer from sleep apnea (Tr. 299).

trash, going outside daily, attending 12-step meetings, watch television and shop.  (Tr. 99,101, 102, 103, 121, 144).  Based on such contradiction and the ALJ's review of the medical testimony, the ALJ concluded that Claimant's subjective symptoms were not credible.  (Tr. 17, 21, 22)..

The medical testimony, like Claimant's lifestyle testimony, similarly contradicts the degree of impairment alleged by Claimant as arising from his sleep-related impairments.  For example, multiple physicians - including those who treated Claimant for sleep apnea - concluded that Claimant could return to work despite Claimant's diagnosis of sleep apnea:  Dr. Ahmed, Claimant's treating physician since 2002, noted that Claimant "is quite an intelligent man and quite capable of performing his duties."  (Tr. 339);  Dr. Kurapati, who was well aware of Claimant's sleep-related complaints and impairments, stated, "[Claimant] would actually benefit from going back to work, as being unemployed and not able to get any money for the past 6 months is adding monetary stress which is aggravating his depression."  (Tr. 307); Dr. Lilly, who determined Claimant's mental RFC in March 2005, concluded "[Claimant] retains the ability to learn and to perform a variety of work-like activities in settings that require limited interactions with others, . . . ."  (Tr. 280).

Based on this Court's review of Claimant's lifestyle evidence and the medical evidence, the Court finds the ALJ's conclusion as to the minimal impact of Claimant's sleep-related impairments on his ability to do basic work functions is supported by substantial evidence.

2.    Whether the ALJ Failed to Properly Consider All of Claimant's Impairments
      When Determining Claimant's RFC and Limitations.

The ALJ in the present case determined Claimant maintained the RFC to perform medium work. (Tr. 21). Additionally, the ALJ determined Claimant "should not do overhead lifting or reaching; should work in a low stress environment with no production line type of pace or independent decision making responsibilities; is limited to unskilled work involving only routine and repetitive instructions and tasks; should have minimal, no more than occasional interaction with other persons." (Tr. 21). At the hearing, the ALJ relayed the above RFC and accompanying limitations to the Vocational Expert, ["VE"], and inquired as to whether there existed jobs in the regional or national economy that accommodated "such a person." (Tr. 46). The VE affirmatively responded, citing jobs as a kitchen helper, equipment cleaner and packer. (Tr. 46). When asked if there were any jobs that accommodated the same individual but with a light exertion level of work, the VE again affirmatively responded, citing jobs as an office helper, mail clerk in the private industry and sewing machine operator. (Tr. 46).

Claimant presently argues the ALJ failed to consider all of Claimant's relevant impairments in step five of the sequential analysis, resulting in a faulty determination of Claimant's RFC and limitations. Commissioner contends that the ALJ properly balanced the relevant medical evidence, testimony and credibility determinations in arriving at Claimant's RFC.

After a claimant has met their burden of showing they are not able to perform their past relevant work, the burden shifts to the Commissioner to show that the claimant is capable of performing a significant number of jobs in the national economy. McLamore v. Weinberger, 538 F.2d 572 (4th Cir. 1976). The ALJ must consider the claimant's RFC as well as vocational factors including the claimant's age, education and work experience. 20 C.F.R. §§ 404.1520,

404.1545.  The RFC is what a claimant can still do despite his limitations.  20 C.F.R. §

404.1545.  Specifically, the RFC is an assessment based upon all the relevant evidence and may

include descriptions of symptoms, observations by treating physicians, neighbors, family or

other persons.  Id.  The ALJ must consider these descriptions and observations when determining

to what extent an impairment keeps a claimant from performing particular work activities.  Id.

When considering a claimant's subjective symptoms, the ALJ must evaluate the extent to which

the claimant's symptoms "can reasonably be accepted as consistent with the objective medical

evidence and other evidence."  20 C.F.R. § 404.1529; see, generally, Craig, 76 F.3d at 592-93.

This Court finds there is substantial evidence to support the ALJ's determinations as to

Claimant's RFC and accompanying limitations.  First and foremost - regarding Claimant's

physical RFC - the Physical RFC Assessment report dated March 16, 2005 concluded Claimant

is capable of "medium work" and the Physical RFC Assessment dated September 1, 2004

concluded Claimant's RFC is "non-severe physically."  (Tr. 248, 275).  It is noted that neither of

the Physical RFC reports document that Claimant has any additional physical limitations.  (Tr.

243, 270).  While Claimant alleged additional physical limitations, the evaluating physician on

the Physical RFC Assessment dated September 1, 2004 concluded "the medical evidence fails to

support the disabling degree of pain and limitations alleged by the claimant. . . . Therefore, the

claimant is not felt to the credible."  (Tr. 248).  Based on the aforementioned medical evidence

as well as the entire medical record, the ALJ's determination of Claimant's physical RFC is

based on substantial evidence.

Regarding Claimant's mental RFC, the ALJ reasonably relied on Dr. Lilly's report dated

March 26, 2005 that concluded Claimant "retains the ability to learn and perform a variety of

work-like activities in settings that require limited interactions with others, focus on production demands, and stress. (Tr. 280). The ALJ also relied on Dr. Courts' report that concluded "if the information about his behavior at work presented by Larry is accurate, he does not appear to be a serious risk for aggressive or violent behavior." (Tr. 238).

Claimant's assertions that his anger, personality issues, depression, sleepiness, poor memory/concentration and GAF scores prevent him from returning to work are not supported by the record. To the contrary, Dr. Kurapati, in 2004, diagnosed Claimant with depression while simultaneously noting that Claimant's depression would likely be improved by returning to work. (Tr. 307). In 2005, Dr. Kurapati diagnosed Claimant with bi-polar disorder and assigned a GAF score of 50 while simultaneously noting that Claimant's mental status was "intact," that Claimant had a "good range of affect" and that he "interacted and communicated well." (Tr. 365). Regarding Claimant's excessive daytime sleepiness, the ALJ properly noted that Claimant's subjective symptoms are contradicted by the medical evidence and by Claimant's testimony. (Tr. 19, 22, 339, 307, 280). Finally, regarding Claimant's alleged memory and concentration limitations, the ALJ properly relied on Dr. Lilly report discrediting Claimant's subjective symptoms of memory and concentration deficiencies. (Tr. 278, 294).

Based upon the medical evidence and Claimant's testimony, the ALJ's conclusion that "the objective evidence does not support the claimant's subjective complaints" and the ALJ's determination of Claimant's RFC and limitations is supported by substantial evidence.

3.    Whether the ALJ Failed to Consider the Combined Effects of Claimant's Impairments.

Claimant alleges the ALJ failed to consider the combined effects of his impairments throughout the disability determination. Commissioner contends the ALJ did consider the combined effects of Claimant's impairments, as evidenced by his statements in his decision.

The ALJ has a duty to consider the combined effects of a claimant's impairments. 20 C.F.R. § 404.1512; Hines v. Bowen, 872 F.2d 56, 59 (4th Cir. 1989). "Congress explicitly requires that "the combined effects of all the individual's impairments' be considered, 'without regard to whether any such impairment if considered separately would be sufficiently severe." Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989) (citation omitted). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." Id. at 50. Additionally, "the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." Id.

In the present case, the ALJ made frequent reference to the combined effects of Claimant's impairments such that this Court finds the ALJ complied with the requirements of 20 C.F.R. § 404.1523. In the introductory paragraphs, the ALJ explained that he was required to determine whether Claimant had a "medically determinable impairment that is 'severe' or a combination of impairments that is 'severe." (Tr. 15). Similarly, when determining the severity of Claimant's impairments and Claimant's RFC, the ALJ stated he had carefully considered Claimant's "testimony, the medical evidence of record and the record in its entirety" and was aware of his duty to "consider all of the claimant's impairments, including impairments that are not severe." (Tr. 15, 17). When determining whether Claimant's impairments met or equaled a Listing, the ALJ found "that the claimant's impairment(s) considered singly or in combination are not the level of severity to meet or equal any of the impairments detailed in Appendix 1,

Subpart P, Regulations No. 4." (Tr. 17). Finally, when determining Claimant's RFC and Claimant's ability to return to work, the ALJ stated he "considered all symptoms" and concluded that Claimant "does experience symptoms of depression, irritability and personality problems from time to time, but not to the frequency and severity alleged.." (Tr. 21, 22).

The ALJ further evidenced his consideration of the impact of Claimant's combined impairments by referencing his reliance on medical reports from physicians who treated Claimant for multiple impairments. For example, Dr. Kurapati treated Claimant's depression, bi-polar disorder, sleep-related impairments, and personality disorders and concluded that Claimant could return to work. Similarly, the Physical and Mental RFC reports took into consideration all of Claimant's impairments and also reported that Claimant was capable of returning to work. At the completion of his analysis, the ALJ concluded that many of Claimant's subjective symptoms were not credible such that any further analysis as to their combined impact was unnecessary.

This Court also finds the ALJ complied with the Fourth Circuit requirement to provide "adequate explanation to show he had considered the combined effect of the impairments so as to allow proper judicial review." Reichenbach v. Heckler, 808 F.2d 309, 312 (4th Cir. 1989). In Reichenbach, the ALJ merely listed the claimant's impairments and, without any further analysis, concluded they were not severe. The Court remanded the case, holding that while the ALJ may have considered the combined effects of the claimant's impairments, he did not articulate that he had done so such that the Court could assure he had complied with the statute. Id. Unlike the ALJ in Reichenbach, the ALJ in the present case analyzed each of Claimant's impairments - individually and against the entire backdrop of the medical evidence and

testimony - before concluding the evidence, as a whole, did not support a finding for disability. For the aforementioned reasons, the Court finds the ALJ adequately considered the combined effects of Claimant's impairments.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.	Claimant's Motion for Summary Judgment be DENIED.

2.	Commissioner's Motion for Summary Judgment be GRANTED. The ALJ properly determined that Claimant's sleep-related impairments were non-severe, properly determined Claimant's RFC and properly considered the combined effects of Claimant's impairments. In this case, there is substantial evidence to support the ALJ's decision and it should therefore be affirmed.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: August 28, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE